IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICHARD W. BYRD,                                     Case No. 6:15-cv-02359-SB

               Plaintiff,                          **OPINION AND ORDER**

   v.

CAROLYN W. COLVIN,
Commissioner of Social Security
Administration,

               Defendant.

_____

**BECKERMAN, Magistrate Judge.**

     Richard William Byrd ("Byrd") seeks judicial review of the final decision by the Social

Security Commissioner ("Commissioner") denying his applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the

Social Security Act ("SSA"). This Court has jurisdiction to review the Commissioner's decision

pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the Commissioner's decision is

REVERSED and REMANDED for additional proceedings.

## BACKGROUND

     Byrd was born in 1972, making him thirty-nine years old on July 13, 2011, the alleged

disability onset date. (Tr. 25.) Byrd completed eleventh grade and later earned a GED, and his

past work experience includes working as a heavy equipment operator, service writer for a car dealership, and forklift driver. (Tr. 37, 55.) Byrd alleges disability due to a neck and back injury with nerve damage in his hands and arms, sleep apnea, heart problems, high blood pressure, broken elbow and finger, diabetes, depression, and stomach ulcers. (Tr. 260.)

Byrd was involved in a motorcycle crash in November 2008, and sustained a compound fracture to his left leg. (Tr. 486.) On January 13, 2010, Dr. Fariba Vesali conducted an orthopedic evaluation and examined Byrd due to reoccurring pain in Byrd's leg. (*Id.*) Dr. Vesali observed that Byrd "did not have any difficulties" getting on and off the exam table or taking his shoes on and off. (Tr. 487.) She also observed that Byrd walked slowly but without an abnormal gait, although he routinely used a cane. (*Id.*) Dr. Vesali opined that Byrd could walk, stand, and sit with no limitations, and did not require an assistive device. (Tr. 488.) She further opined that Byrd could lift fifty pounds occasionally and twenty-five pounds frequently, and could occasionally climb stairs, stoop, kneel, crouch, or crawl. (Tr. 489.)

On January 13, 2010, Dr. Stefanie Stolinsky, a clinical psychologist, conducted a psychological evaluation. (Tr. 490.) She reported that Byrd appeared open, alert, and well-oriented, but had poor attention and concentration due to his leg pain. (Tr. 491.) Dr. Stolinsky opined that Byrd's recent memory was "somewhat impaired," but his long term memory appeared intact. (*Id.*) She felt he was a "concrete thinker." (*Id.*) Dr. Stolinsky administered the Wechsler Adult Intelligence Scale-Third Edition, and found that Byrd's cognitive abilities were in the low average range, as were his thinking and reasoning skills. (Tr. 493.) She found that his verbal reasoning abilities, verbal comprehension abilities, and nonverbal reasoning abilities were in the low average range. (Tr. 493-94.) Dr. Stolinsky also noted that emotional or motivational difficulties from Byrd's pain may have interfered with his test results. (*Id.*) In any event, she

opined that Byrd had marked difficulties in maintaining concentration, persistence, and pace, social functioning, and restricted activities of daily living. (Tr. 496.)

On June 15, 2011, Dr. Tinko Zlatev examined the results of Byrd's cervical MRI, and concluded that he suffered from acute cervical kyphosis at the C5-6 vertebral level. (Tr. 402.) Dr. Zlatev also noted a disc bulge at the C5 level, degenerative disc disease at the C5-6 and C6-7 levels, and a large disc bulge at C6-7. (*Id.*)

On August 29, 2011, Dr. Aleksandar Curcin examined Byrd and found he suffered from degenerative disc disease of the cervical vertebrae, and ordered a cervical discectomy and fusion. (Tr. 340.)

On January 18, 2012, Byrd was scheduled to undergo a cervical discectomy procedure. (Tr. 352.) However, doctors were unable to perform the procedure because Byrd's heart rate dropped when his body was positioned in the surgical position, and the doctors believed it was too dangerous to attempt the lengthy surgical procedure. (*Id.*)

On July 20, 2012, Byrd completed his adult function report. (Tr. 282.) He stated that his ability to work was limited by a loss of feeling in his hands and fingers, as well as weakness in his arms, pain in his neck, and depression. (*Id.*) Byrd's daily routine involved watching television and taking his medication. (Tr. 283.) His wife took care of their children and pets, reminded him to take his medication, handled the finances, and cooked all household meals. (*Id.*) He stated that he needed help with all household chores, and could not lift more than five pounds. (Tr. 285.) He shopped for groceries an hour per week, but did not drive. (*Id.*) He alleged difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, concentration, and using his hands. (Tr. 287.) He also stated that he did not handle stress or changes in routine well. (Tr. 288.)

3- OPINION AND ORDER

On August 27, 2012, Dr. Charles Reagan, a psychiatrist, completed a psychological evaluation. (Tr. 436-40.) He noted that Byrd described only numbness and pain in his right arm and fingers as physical impairments that affected his ability to work. (Tr. 437.) Byrd told Dr. Reagan that he regularly took off his CPAP machine in his sleep. (*Id.*) He also described feelings of depression. (*Id.*) Dr. Reagan opined that Byrd had not described symptoms of major depression, he did not observe pain behaviors throughout the interview, and Byrd had no difficulty following and remembering instructions. (Tr. 439.) Dr. Reagan noted that Byrd's 2010 evaluation with Dr. Stolinsky described "poor abstraction and low average intelligence," but Dr. Reagan found that Byrd had a higher than normal intelligence level and had excellent abstract abilities. (*Id.*) Dr. Reagan stated that the 2010 evaluation was either incorrect or Byrd manipulated the test. (*Id.*) He also noted that "there [were] reliability issues," in the mental status examination and there was "evidence for malingering." (Tr. 438-39.)

On September 7, 2012, Dr. Raymond Nolan completed an administrative examination of Byrd. (Tr. 441.) Dr. Nolan opined that Byrd suffered from chronic low back pain and chronic back pain with right cervical radiculopathy. (Tr. 442.) Dr. Nolan stated that Byrd could bend, twist, and turn his back and neck on an occasional basis, push or pull on an occasional basis, and his ability to lift and carry was limited to ten pounds frequently and twenty pounds occasionally. (*Id.*) He noted that Byrd's communication skills were "quite adequate," and that Byrd could sit for sixty minutes at a time for at least six hours per day. (*Id.*) Furthermore, he stated that Byrd could walk or stand for at least two hours in an eight-hour day. (*Id.*)

On March 7, 2013, Dr. James Sinnott, Byrd's treating physician, wrote a letter detailing his opinion of Byrd's conditions. (Tr. 461-62.) He stated that Byrd suffered from diabetes mellitus, severe sleep apnea, and cervical radiculopathy, and that the conditions were permanent. (*Id.*) Dr. Sinnott noted that Byrd's symptoms included sleepiness in the daytime, generally poor

sleep, depression, fatigue, and weakness, twitching, and poor coordination in his hands. (*Id.*) Dr. Sinnott also noted that Byrd's medications affected his concentration. (Tr. 462.) Functionally, Dr. Sinnott opined that Byrd was unable to walk more than two hours in an eight-hour workday, could sit for one hour at a time, and could perform fine manipulation two to three hours per eight-hour workday. (*Id.*) He also noted that because Byrd had a "prior Worker's Comp [sic] issue in which he has a restriction of [five] pound weight lifting" he should not lift more than ten pounds. (*Id.*) Dr. Sinnott stated that these problems would likely keep Byrd from work for more than two days per month, and that his problems were permanent and unchanging. (*Id.*)

On December 20, 2013, Dr. Nolan evaluated Byrd again. (Tr. 470-72.) He noted that Byrd suffered from chronic neck and low back pain, diabetes mellitus, obstructive sleep apnea, and right-sided weakness in grip strength and sensory deficits in his right hand. (Tr. 472.) Functionally, Dr. Nolan opined that Byrd could bend, twist, and turn his neck and back a limited amount, lift up to ten pounds frequently and twenty pounds occasionally. (*Id.*) He stated that Byrd could push or pull infrequently, and could sit for at least six hours in an eight hour day if allowed to change positions as needed. (*Id.*) He rated Byrd's communication skills as normal, and stated that Byrd could stand or walk for at least four hours in an eight-hour workday. (*Id.*)

An administrative law judge ("ALJ") convened a hearing on March 12, 2014, at which Byrd testified about the limitations resulting from his impairments. (Tr. 34-61.) Byrd testified that he received disability benefits from November 2008 until December 2009 due to obesity, depression, and problems with his left leg due to a motorcycle crash. (Tr. 40.) Byrd returned to work as a heavy equipment operator, but alleged he could not perform the work due to twitching in his hands. (Tr. 41.) He testified that he was losing feeling in his right arm, his neck was painful, and his sleep apnea was causing problems. (Tr. 44.) The ALJ asked about the aborted surgical procedure to repair Byrd's cervical vertebrae, and Byrd testified that he was under

5- OPINION AND ORDER

general anesthesia on the operating table when the doctors decided the procedure was too risky because he was not receiving sufficient oxygen flow to his brain. (Tr. 45.) He stated that his regular medications included Norco, Flexeril, insulin, metaformin, aspirin, an anti-depressant, and a blood pressure medication. (Tr. 46.) He further testified that his medication made him tired and unmotivated. (*Id.*) When the ALJ asked why Byrd could not perform a sedentary job, Byrd stated that there was no job that he could perform because he needed to switch positions too often. (Tr. 47-48.) Byrd testified that he was unable to hold a writing utensil or a small chainsaw due to the numbness and pain in his hand. (Tr. 49-50.) Furthermore, Byrd testified that his leg became stiff if he sat or stood for too long; walking was painful; his sleep apnea machine was ineffective; and his neck was painful and "popped" when he moved it. (Tr. 50-54.)

The ALJ posed a series of questions to a vocational expert ("VE"), who also testified at Byrd's hearing. The ALJ asked the VE to contemplate a hypothetical worker of Byrd's age, education, and work experience who was limited to lifting or carrying up to twenty pounds occasionally, lifting or carrying up to ten pounds frequently, standing or walking for a total of two hours, and sitting for a total of six hours in an eight-hour workday with normal breaks. (Tr. 57.) Additionally, the hypothetical worker would be allowed to alternate sitting or standing throughout the day, could engage in occasional bilateral pushing or pulling and foot control operation, as well as occasionally climbing ramps or stairs, but never climbing ladders, ropes, or scaffolds, and occasionally stooping, kneeling, or crouching, but never crawling. (*Id.*) The hypothetical worker could engage in frequent bilateral reaching, should avoid concentrated exposure to extreme cold, as well as hazardous machinery and refrain from driving. (*Id.*) The worker could understand and carry out simple instructions in a workplace with few changes, and could only have occasional interaction with the public. (*Id.*) The VE testified that such a hypothetical worker could perform work as a patcher, taper, or polisher. (Tr. 58.)

6- OPINION AND ORDER

In a written decision issued on April 11, 2014, the ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a)(4), and found that Byrd was not disabled. The Appeals Council denied Byrd's petition for review, making the ALJ's decision the Commissioner's final decision. Byrd timely appealed to federal court.

## THE FIVE-STEP SEQUENTIAL PROCESS

### I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which. . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If

7- OPINION AND ORDER

the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

At the first step of the sequential process, the ALJ found that Byrd had not engaged in substantial gainful activity since July 13, 2011, the alleged disability onset date. At the second step, the ALJ found that Byrd had the severe medically determinable impairments of cervical degenerative disc disease; disc bulge with cervical radiculopathy; brachial neuritis; cervicalgia; peripheral vascular disease; mood disorder; history of left tibia and fibula fracture, status post open reduction internal fixation; status post left knee injury; and rule out antisocial personality disorder. (Tr. 18.)

At the third step, the ALJ found that Byrd's combination of impairments was not equivalent to any of those in the Listing of Impairments. The ALJ then assessed Byrd's residual functional capacity ("RFC") and found that he could:

> lift and/or carry 20 pounds occasionally. He can lift and/or carry up to 10 pounds frequently. He can stand and/or walk for a total of about two hours and sit for a total of about six hours in an eight-hour workday, with normal breaks. He must be allowed to alternate sitting or standing positions as needed throughout the day while remaining on task. He is limited to occasional bilateral pushing and pulling and foot control operation. He can occasionally climb ramps or stairs. He can never climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, or crouch. He can never crawl. The claimant is limited to frequent bilateral reaching. He must avoid concentrated exposure to extreme cold. He must avoid concentrated exposure to hazardous machinery and must refrain from work related driving. The claimant can understand and carry out simple instructions in a work environment with few workplace changes. He is limited to occasional interaction with the public.

(Tr. 20.)

At the fourth step, the ALJ concluded that Byrd was unable to perform any past relevant work. (Tr. 24.) At the fifth step, the ALJ concluded that jobs existed in significant numbers in the national economy that Byrd could perform, including patcher, taper, and polisher. (Tr. 25.)

8- OPINION AND ORDER

Accordingly, the ALJ ruled that Byrd was not disabled within the meaning of the Social Security Act. (Tr. 26.)

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "not supported by substantial evidence or [are] based on legal error." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

Byrd alleges that the ALJ erred by improperly assessing: (A) Dr. Sinnot's medical opinion; (B) his subjective symptom testimony; and (C) step five of the five-step sequential process.

///

///

9- OPINION AND ORDER

## I.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the ALJ must determine credibility and resolve the conflict." *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). "An ALJ may only reject a treating physician's contradicted opinions by providing specific and legitimate reasons that are supported by substantial evidence." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions, however, is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

### B.    Application of Law to Fact

The ALJ gave little weight to Dr. Sinnott's opinion because the doctor relied on stale evidence, his opinion conflicted with his own treatment notes, and the opinion was unsupported

by the objective medical evidence. While Dr. Sinnott is Byrd's treating physician, his opinion is contradicted by other physicians of record; therefore, the ALJ must provide specific and legitimate reasons to reject his opinion. The ALJ did so here.

First, the ALJ gave little weight to Dr. Sinnott's opinion because it relied in part on a stale worker's compensation claim. (Tr. 24, 462.) Dr. Sinnott noted that Byrd "has a prior Worker's Comp [sic] issue in which he has a restriction of [five] pound weight lifting, so technically he should not be lifting over 10 pounds." (Tr. 462.) The ALJ noted that there is no evidence of a worker's compensation claim with such a restriction in the current file, and suggested that Dr. Sinnott was "out of touch" with Byrd's current lifting abilities, as many consulting and examining physicians stated that Byrd was capable of lifting ten pounds frequently and twenty pounds occasionally. (Tr. 24.) Byrd argues that discrediting Dr. Sinnott because he had access to evidence outside the record is inappropriate. However, Dr. Sinnott's reliance on restrictions associated with a prior worker's compensation claim is unpersuasive not just because that evidence is not part of the record, but because it is stale. *See Stone v. Heckler, 761 F.2d 530, 532 (9th Cir. 1985)* (noting that generally, "the most recent medical report is the most probative"). That Dr. Sinnott's opinion was based in part on outdated and unavailable information is a specific and legitimate reason for the ALJ to give the opinion less weight. *See Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (medical evidence that predated the claimant's disability onset date did not establish any work-related limitations).

The ALJ also gave little weight to Dr. Sinnott's opinion because it conflicted with his own treatment notes. An ALJ may reject a medical opinion that is unsupported by the physician's clinical findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). The ALJ pointed out that Dr. Sinnott's notes from an appointment on November 1, 2012 conflict with his

11- OPINION AND ORDER

opinion. (Tr. 24.) In his letter opinion, Dr. Sinnott opined that Byrd would need to lie down

during the day due to depression. (Tr. 462.) In his notes, however, Dr. Sinnott noted that Byrd

had reported that "his depression feels okay on his depression meds." (Tr. 451.) In the same

letter opinion, Dr. Sinnott opined that Byrd would be forced to contend with side effects from his

medications, but his notes reveal that Byrd denied medication side effects. (Tr. 451, 462.)

Finally, Byrd denied any musculoskeletal problems, in contrast to Dr. Sinnott's evaluation that

Byrd's medical issues were "permanent" and "unchanging." (*Id.*) The conflict between Dr.

Sinnott's opinion and his own treatment notes is supported by substantial evidence, and is a

specific and legitimate reason for the ALJ to give the opinion less weight.

Finally, the ALJ gave little weight to Dr. Sinnott's opinion because it was unsupported by

the objective medical evidence of record. (Tr. 24.) However, the ALJ failed to point to any

specific medical evidence of record. (*Id.*) The ALJ must give specific and legitimate reasons

supported by substantial evidence for rejecting a treating physician's opinion, and simply stating

that an opinion conflicts with objective medical evidence is not sufficiently specific. *See*

*Garrison*, 759 F.3d 1012. This error was harmless, however, as the ALJ gave two additional

specific and legitimate reasons for giving little weight to Dr. Sinnott's opinion, as discussed

above. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). In sum, the ALJ did not err in

assigning little weight to Dr. Sinnott's opinion.

**II.    SUBJECTIVE SYMPTOM TESTIMONY**

**A.    Applicable Law**

In the Ninth Circuit, absent an express finding of malingering, an ALJ must provide

specific, clear, and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s
> reasons for rejecting the claimant's testimony must be clear and convincing. If an
> ALJ finds that a claimant's testimony relating to the intensity of his pain and other

limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted).

Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina*, 674 F.3d at 1104 ("[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).") (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid," and (2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas*, 278 F.3d at 959 (citing *Morgan*, 169 F.3d at 600).

## B.    Application of Law to Fact

Although the ALJ noted "reliability issues" stemming from Dr. Reagan's examination of Byrd (Tr. 22-23), the ALJ did not make an express finding of malingering, and therefore the ALJ was required to provide specific, clear, and convincing reasons for rejecting Byrd's testimony.

The ALJ found that Byrd's subjective symptom testimony was not entirely credible, because it was not supported by the medical evidence and inconsistent with his activities of daily living.

The ALJ found that the objective medical evidence does not support Byrd's allegations of disabling pain. (Tr. 21.) The ALJ supported her conclusion with a detailed summary of Byrd's physical functioning from 2011 to 2013, as reported to his physicians. (*Id.*) Indeed, those contemporaneous reports do not square with Byrd's allegations of a disabling level of physical functioning, and the ALJ did not err in finding Byrd not entirely credible based upon conflicting medical evidence. *See Bowers*, 2012 WL 2401642, at *9 (holding that clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence"); *Boyd v. Colvin*, No. 6:15-cv-01399-AC, 2016 WL 7104864, at *4 (D. Or. Nov. 9, 2016) ("The ALJ did not err in using [the claimant's] medical records to contrast her testimony that she lived in constant pain[.]").

However, the only other reason cited by the ALJ to doubt Byrd's subjective symptom testimony is its inconsistency with Byrd's activities of daily living. (Tr. 21.) The ALJ cited only to the fact that Byrd earned $719 for a few days of work in November 2011, he spends most of his day watching television, and he spends time on the computer, watches movies, and plays games with his children. (*Id.*) The daily activities cited by the ALJ neither contradict Byrd's subjective symptom testimony nor establish that he is able to spend a substantial part of his day performing activities that are transferable to a work setting. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 (9th Cir. 2007) ("It does not follow from the fact that a claimant tried to work for a short period of time and, because of his impairments, failed, that he did not then experience pain and limitations severe enough to preclude him from maintaining substantial gainful employment. Indeed, we have suggested that similar evidence that a claimant tried to work and failed actually supported his allegations of disabling pain."); *Orn v. Astrue*, 495 F.3d 635, 639 (9th Cir. 2007)

14- OPINION AND ORDER

("We agree with [the claimant] that reading, watching television, and coloring in coloring books are activities that are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace."). Accordingly, the ALJ erred in relying on Byrd's daily activities as a basis for an adverse credibility determination.

Setting aside inconsistency with activities of daily living, the only valid reason the ALJ cited to doubt Byrd's credibility is the lack of medical evidence to support his allegations of disabling symptoms. The Ninth Circuit has been clear that "lack of medical evidence cannot form the sole basis for discounting pain testimony[.]" *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Accordingly, the lack of supporting objective medical evidence, standing alone, is legally insufficient to support the ALJ's adverse credibility determination. *Robbins*, 466 F.3d at 884 (where the ALJ's initial reason for adverse credibility determination was legally insufficient, his sole remaining reason premised on lack of medical support for claimant's testimony was legally insufficient); *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("[A] finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain.").

## III.    STEP FIVE ERROR

### A.    Applicable Law

"The hypothetical an ALJ poses to a vocational expert, which derives from the RFC, 'must set out all the limitations and restrictions of the particular claimant.'" *Valentine,* 574 F.3d at 690 (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)). Therefore, "an RFC that fails to take into account a claimant's limitations is defective." *Id.*

### B.    Application of Law to Fact

Byrd argues that the ALJ failed properly to evaluate Dr. Nolan's diagnosis restricting Byrd to occasionally turning his neck and back, as well as restricting the turning of the neck and

15- OPINION AND ORDER

trunk. (Tr. 472.) The ALJ gave great weight to Dr. Nolan's opinion and included nearly all of his restrictions in the RFC and hypothetical to the VE, but failed to explain why she did not include the neck and trunk restriction.

The Commissioner argues that the ALJ did not err, and if she did, Byrd fails to identify any harm. "[A]n RFC that fails to take into account a claimant's limitations is defective." *Valentine*, 574 F.3d at 690. Here, the ALJ gave great weight to Dr. Nolan's opinion, but the RFC failed to take into account all of the limitations identified by Dr. Nolan, and the ALJ failed to explain why she did not include the limitations in the RFC. As a result, the ALJ erred in formulating the RFC. *See Stoner v. Colvin,* No. C14-1293 RSM, 2015 WL 1636911, at *4 (W.D. Wash. Apr. 10, 2015) (reversing and remanding for further proceedings where the "ALJ omitted, without comment, a limitation included in a medical opinion" and "[c]onsequently, the ALJ's RFC determination failed to account for all limitations assessed by reviewing doctors").

## IV.    REMAND

In light of the errors identified herein, the Court must address the proper remedy. In a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [three] conditions are met." *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, a district court should reverse and remand for an award of benefits when the following "credit-as-true" criteria are present:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id*.

The "credit-as-true" criteria are not present here. Importantly, the VE did not consider or testify about the impact that a neck and trunk restriction might have on Byrd's ability to perform jobs available in the economy. As a result, further administrative proceedings are necessary. *See Ellis v. Astrue*, No. CV-10-6253-HZ, 2011 WL 5025839, at *7-11 (D. Or. Oct. 20, 2011) (remanding for further administrative proceedings where the ALJ failed to incorporate in the RFC "head and neck limitations" recommended by (the same) Dr. Raymond Nolan, despite the ALJ's statement that he accepted all of Dr. Nolan's work-related restrictions); *see also Echaury v. Astrue*, No. CV 12-1245 FMO, 2013 WL 436007, at *4 (C.D. Cal. Feb. 4, 2013) (remanding for further administrative proceedings where the ALJ "failed to provide any reason, let alone a specific and legitimate one, for rejecting [the doctor's] findings that plaintiff could perform only occasional gripping and/or turning and fixed positioning of the neck"); *Tomblinson v. Astrue*, No. EDCV 09-1819-MLG, 2010 WL 1752514, at *3 (C.D. Cal. Apr. 29, 2010) (remanding for further administrative proceedings where the "ALJ's assessment of Plaintiff's residual functional capacity did not address [the treating physician's] findings regarding Plaintiff's neck limitations").

## CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED for further proceedings consistent with this opinion.

DATED this 14th day of March, 2017.

_____
Stacie Beckerman
United States Magistrate Judge

17- OPINION AND ORDER